CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

MAR 18 2020

JULIA C. DUDLEY, CLERK
BY: A. Beeson
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

DERRIKE ETHAN WALKER,                )
                                     )
            Plaintiff,               )        Civil Action No. 7:18CV00519
                                     )
v.                                   )        **MEMORANDUM OPINION**
                                     )
LANDON KYLE JOHNSON, et al.,         )        By: Hon. Glen E. Conrad
                                     )        Senior United States District Judge
            Defendants.              )

Derrike Ethan Walker filed this action under 42 U.S.C. § 1983 and Virginia law against Landon Kyle Johnson, Chadwick Wayne Custer, and other unknown defendants. Johnson and Custer have moved for summary judgment. The motion has been fully briefed, and the court heard oral argument on the motion on March 10, 2020. For the reasons set forth below, the motion will be granted in part and denied in part.

### Factual Background

The following facts are either undisputed or presented in the light most favorable to Walker. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor [when ruling on a motion for summary judgment].").

The events giving rise to this action were set in motion by a vehicle stop on the morning of April 29, 2016, at a gas station in Botetourt County, Virginia. At that time, Johnson and Custer worked for the Botetourt County Sheriff's Office ("BCSO") as narcotics investigators. Johnson and Custer, along with one other officer, David Dillow, were the sole members of the narcotics department. Johnson Dep. 33, ECF No. 44-3.

The stop involved two vehicles, one of which was driven by Walker. The other vehicle was driven by Kyle Bushong. The record contains conflicting information regarding what led to the stop in the first instance. According to a written narrative prepared by Johnson after the stop, Johnson decided to follow Bushong's vehicle to the gas station after "the driver and the passenger began to turn and look back at [Johnson's] vehicle multiple times." Pl.'s Ex. 2, ECF No. 44-2. During his deposition, however, Johnson testified that he "saw a gentleman and it looked like he was rolling something in the front seat, so [Johnson] followed that vehicle." Johnson Dep. 44.

Custer, who was traveling nearby in a separate patrol vehicle, also followed Bushong's vehicle to the gas station. According to a written narrative prepared by Custer after the stop, he and Johnson "watched a white male exit a red in color Chevrolet and approach a green in color Subaru Outback which was parked on the Northern most part of the parking lot." Pl.'s Ex. 6, ECF No. 44-6. "The white male later identified as . . . Bushong handed the white male in the driver seat of the Subaru Outback later identified as . . . Walker a sum of money."[1] Id. After observing the exchange of money, Johnson and Custer approached the vehicles and identified themselves as law enforcement officers. Id.; see also Pl.'s Ex. 2. At that point, Johnson and Custer confirmed that Walker was driving the Subaru Outback and that he was accompanied in his vehicle by Logan Perdue. Pl.'s Exs. 2 & 6. Custer knew Perdue from previous encounters, and Johnson claimed to be aware that both Perdue and Walker may be involved in illegal drug activity.[2] Pl.'s Exs. 2 & 6. Custer reported that "Perdue had numerous track marks on his arms and seemed lethargic,"

---

[1] The written reports and transcripts in the record contain various typographical errors. The court quotes from the reports and transcripts as written, rather than entering "[sic]" after each error.

[2] During his deposition, Johnson testified that he was not personally "aware of" Walker prior to the stop, even though he suggested otherwise in his written narrative. Johnson Dep. 48–49. Johnson instead indicated that Custer had previously "dealt with [Walker] criminally," and had reported that Walker was a "drug dealer." Id. Custer, however, testified to the contrary. See Custer Dep. 64, ECF No. 44-7 ("I knew the boy that was with [Walker] but I didn't . . . know [Walker] before that . . . . I will be honest with you. I don't think I even knew of him.").

and that Custer "could also smell the odor of burnt marijuana coming from [Walker's] vehicle." Pl.'s Ex. 6. When Custer advised Walker and Perdue that the officers were there to speak with them regarding "suspicious activity which looked like [a] drug transaction," Walker informed the officers that he had just collected rent money from Bushong. Id.

Johnson decided to call Cody Noakes, a canine handler with the BCSO, for assistance. Pl.'s Ex. 2. Noakes arrived shortly thereafter with a drug-detection dog. According to the written narrative that Noakes prepared following the stop, Johnson and Custer asked Noakes to have the dog perform an external sniff of both vehicles. Pl.'s Ex. 9, ECF No. 44-9. The dog alerted to the presence of drugs in Bushong's vehicle and it was searched by the officers. Id. However, the officers only found a glass device that had been used to smoke marijuana. Id. The dog also alerted to the presence of drugs in Walker's vehicle. Id. The officers searched Walker's vehicle and located two "bags of suspected methamphetamine." Id.; see also Pl.'s Ex. 8, ECF No. 44-8. Additionally, a clear bag containing what appeared to be cocaine was found in Walker's back pocket. Pl.'s Exs. 2 & 8; see also Walker Dep. 33, 63 (acknowledging that drugs were located in his car and in his pocket).

After searching Walker's vehicle and his person, Johnson and Custer allegedly told Walker that they had been "watching" him, his family, and their house. Walker Dep. 44. Walker and his wife, Olivia Brown ("Olivia"), were expecting their second child, and Walker feared that he would lose his family if he went to jail. Id. at 46. Johnson and Custer agreed to "help" Walker if he would work for them as a confidential informant. Id.

On May 4, 2016, Walker signed a cooperation agreement with the BCSO. Pl.'s Ex. 13, ECF No. 44-13. Walker agreed to work as a confidential informant in hopes that the officers "would keep their promise of no charges" arising from the stop at the gas station. Walker Dep.

3

73. The cooperation agreement expressly provided that "any cooperation given to the Botetourt County Sheriff's Office [would] be brought to the attention of the Botetourt County Commonwealth's Attorney's Office." Pl.'s Ex. 13. Walker was "handled" as a confidential informant by Custer. Pl.'s Ex. 30, ECF No. 44-30.

On May 4 and 5, 2016, Walker engaged in undercover drug transactions with an individual under investigation by the BCSO, who was subsequently charged and arrested. See Pl.'s Ex. 14, ECF No. 44-14; Pl.'s Ex. 15, ECF No. 44-15. Although Walker's cooperation proved beneficial to the BCSO, his stint as a confidential informant was short-lived. On May 11, 2016, Walker's probation officer in Montgomery County, Virginia, Carlie Cutright, advised Custer that Walker was no longer permitted to work as a confidential informant since he "had admitted on that date that he used [drugs] . . . while doing a transaction as a confidential informant." Cutright Dep. 17–18, ECF No. 44-17.

On July 21, 2016, Walker reported to Cutright's office and tested positive for controlled substances. Id. at 16. That same day, he was taken into custody for violating the terms of his probation in Montgomery County. Id. at 17.

On July 25, 2016, a prosecution report prepared by Custer was sent to the Botetourt County Commonwealth's Attorney pertaining to the April 29, 2016 stop. Pl.'s Ex. 9, ECF No. 44-9; Pl.'s Ex. 51, ECF No. 44-51. The report accused Walker of possessing with intent to distribute a Schedule I or II controlled substance. Pl.'s Ex. 9. The prosecution report was accompanied by an incident report prepared by Custer, and confidential supplements drafted by Custer, Johnson, and Noakes. Id. Although prosecution reports in drug cases are typically prepared after the BCSO receives the results of laboratory testing, the results in Walker's case did not come back

until September 2, 2016, after the prosecution report had already been submitted.[3]  See Dillow Dep. 15, ECF No. 44-22 (affirming that a certificate of analysis is "typically part of the prosecution report"); see also Pl.'s Ex. 24, ECF No. 44-24.  The prosecution report made no mention of the assistance that Walker had provided while working as a confidential informant.

On July 28, 2016, while Walker was still incarcerated, Johnson and Custer arranged for a confidential informant to purchase marijuana from Olivia at the house where she, Walker, and their young daughter resided.  Pl.'s Ex. 20, ECF No. 44-20.  The controlled purchase was monitored through the use of a digital recorder and audio-visual equipment.  Id.  According to a written report prepared following the transaction, the controlled purchase was made in front the couple's child.  Id.  Olivia retrieved the marijuana from a safe in the basement, and used a set of digital scales to weigh the amount requested by the confidential informant.  Id.  After the confidential informant paid for the marijuana, Olivia advised him "that if he needed more to [j]ust stop by."  Id. (internal quotation marks omitted).  Johnson and Custer knew at the time of the controlled purchase that Walker was in jail.  Johnson Dep. 99.

Later that evening, Johnson applied for and obtained a warrant to search Walker and Olivia's house for marijuana and associated items.  Pl.'s Ex. 19, ECF No. 44-19.  The search warrant was executed that same night by Johnson, Custer, and other law enforcement officers. The officers found $1,100.00 in currency, marijuana and other substances, two sets of digital scales, and other drug paraphernalia.  Id.

---

[3] Laboratory testing revealed that one bag retrieved during the vehicle stop contained 1.310 grams of powder that was found to contain cocaine, and another bag contained less than 1 gram of material that was found to contain methamphetamine.  A third bag contained a "substance that may be substantially similar to the chemical structure of a controlled substance."  Pl.'s Ex. 24, ECF No. 44-24.

On August 1, 2016, a grand jury in the Circuit Court of Botetourt County returned an indictment against Walker based on the evidence seized during the vehicle stop. Defs.' Ex. 5, ECF No. 34-5. The indictment alleged that, on or about April 29, 2016, Walker "did unlawfully and feloniously manufacture, sell, give, distribute, or possess with the intent to manufacture, sell, give or distribute a controlled substance, listed as a Schedule I or II controlled substance," in violation of Virginia Code § 18.2-248. Id. According to the indictment, Custer was the only witness who testified before the grand jury. Id.

On August 2, 2016, Johnson and Custer conducted a recorded interview of Walker. Defs.' Ex. 6, ECF No. 34-6. During the interview, they discussed what was found during the search of Walker and Olivia's house. Johnson emphasized that if Walker, who was still incarcerated, denied responsibility for the drugs found during the search, then Olivia could be held responsible:

> But now you've brought your wife into it and all the stuff that we found that's both of y'alls house. Okay? So the issue if, if you're going to say it's not mine, it's not mine, it's not mine then it's you and it's Olivia. And all these charges are equally on her just like they're on you.

Id. at 3. In response, Walker emphasized that he was "not going to let [Olivia] . . . go down for anything." Id. Likewise, when Custer suggested that Olivia was also "on the hook," Walker advised Custer and Johnson that he would "do anything for her." Id. at 9. They discussed the possibility of Olivia working to "help" the officers with the information that Walker had provided regarding other individuals. Id. At that time, Olivia was pregnant with her second child with Walker.

On August 4, 2016, Olivia signed a cooperation agreement with the BCSO. Pl.'s Ex. 29, ECF No. 44-29. Johnson served as Olivia's primary contact or "handler." Defs.' Ex. 7, ECF No. 34-7. Olivia ultimately conducted five drug transactions as a confidential informant. The first

transaction was conducted on August 4, 2016, and the last was conducted on September 2, 2016. Pl.'s Ex. 58, ECF No. 44-58; Pl.'s Ex. 59, ECF No. 44-59. Two of the controlled transactions were conducted at Olivia's house, including one that took place on August 15, 2016. Pl.'s Ex. 34, ECF No. 44-34. Although male narcotics officers with the BCSO were not allowed to be alone with female confidential informants unless they were being observed by another officer, Johnson was left alone with Olivia on at least one occasion, after Custer dropped Johnson off at Olivia's house. Id.; John Mandeville Dep. 57–58, ECF No. 44-21; Custer Dep. 123–24, ECF No. 44-7.

It is undisputed that Johnson and Olivia became romantically involved after Olivia began working as a confidential informant. Johnson testified that he and Olivia first had sex in September of 2016, while they were at Walker and Olivia's house. Johnson Dep. 76, ECF No. 44-3. Other evidence suggests that Johnson and Olivia's romantic relationship began in August of that year. Johnson's cell phone records reveal that he and Olivia called each other over 90 times during the month of August. Pl.'s Ex. 57, ECF No. 44-57. That same month, Johnson created a special Facebook account to use for communicating with Olivia. Pl.'s Ex. 35, ECF No. 44-35. Johnson and Olivia exchanged Facebook messages in which Johnson referred to Olivia as "beautiful," and Olivia indicated that she wished that Johnson could "come over." Id. Johnson also accompanied Olivia to an August 19, 2016 meeting at the Botetourt County Department of Social Services ("DSS"), after Olivia was investigated as a result of selling drugs in front of her daughter. Pl.'s Ex. 33, ECF No. 44-33. Johnson advised the DSS representative that he had "no concern for [Olivia's] children . . . or their safety." Id.

That same month, Johnson started listening to recorded phone calls between Walker and Olivia while Walker was still incarcerated. Johnson Dep. 104. Although Johnson testified that

Custer also listened to the couple's phone calls, Id. at 105, Custer indicated that the recordings were requested by Johnson. Custer Dep. 106.

On October 20, 2016, Walker entered into a written plea agreement with the Commonwealth, pursuant to which Walker agreed to "plead guilty and be found guilty of possession with intent to distribute a schedule I or II controlled substance." Defs.' Ex. 9, ECF No. 34-9. In exchange, the Commonwealth agreed that Walker would be "sentenced to 5 years in the penitentiary, suspended after 1 year 6 months to serve." Id. Walker testified that he only agreed to sign the plea agreement after the Commonwealth's Attorney assured his defense attorney that there would be no additional indictments against Walker or Olivia. Walker Dep. 83, ECF No. 44-1. At the time of his guilty plea, Walker was unaware of Olivia's affair with Johnson. It is undisputed that neither Johnson nor Custer disclosed the relationship to the prosecutor or Walker's defense attorney.

On November 10, 2016, less than one month after Walker pled guilty to the charge arising from the vehicle stop, Olivia gave birth to their second child. According to Walker's evidence, Johnson was at the hospital with Olivia when the baby was born. See Pl.'s Ex. 44, ECF No. 44-44.

That same day, the drugs seized during the search of Walker and Olivia's house were sent to the state lab for testing. Pl.'s Ex. 25, ECF No. 44-25; Pl.'s Ex. 26, ECF No. 44-26. Although officers with the BCSO typically submitted a request for lab analysis immediately following the seizure of narcotics, that practice was not complied with after the execution of the search warrant at Walker and Olivia's house. Custer Dep. at 89–90.

The relationship between Johnson and Olivia continued into 2017. Between August 3, 2016 and June 5, 2017, Johnson communicated with Olivia using his work cell phone over 900

times. Pl.'s Ex. 57. In March of 2017, Olivia spent the night with Johnson in Richmond, while he was traveling for work. Johnson Dep. 14–15. During the course of their relationship, Johnson informed Olivia's mother, Robin Arnholt, that Walker would be "going away for a . . . long time" as a result of "his drug dealing and drug involvement." Arnholt Dep. 12, ECF No. 44-5.

In April of 2017, while Walker was still incarcerated, he sent Olivia an email inquiring about her relationship with Johnson. Defs.' Ex. 16, ECF No. 50-1. When Oliva responded that there was "no fling" and that she had "been going to bed with the kids," Walker advised her that he had been told that Johnson's "car was at the house overnight."[4] Id.

On June 5, 2017, Walker was indicted in connection with the drugs found during the July 28, 2016 search of his and Olivia's house. Pl.'s Ex. 46, ECF No. 44-46. The record reveals that Custer testified before the grand jury and that Johnson was also present. Id.; see also Johnson Dep. 69. Although the search warrant was issued after Olivia sold marijuana to a confidential informant, no charges were brought against Olivia. Instead, the original prosecution report prepared by Custer accused Walker of distributing marijuana. Pl.'s Ex. 28, ECF No. 44-28. The report was later modified to reflect the charged offense of possession with intent to distribute marijuana, rather than distribution of marijuana. Id. However, Custer had "no idea" who made that change. Custer Dep. 86. The prosecution report also included a modified version of a confidential narrative prepared by Custer related to the search of the house. Pl.'s Ex. 28. Unlike an earlier version, which made no mention of Walker, see Pl.'s Ex. 27, ECF No. 44-27, the amended version attributed responsibility to Walker for the items seized from the house. Rather than relaying Walker's desire to protect Olivia from being charged, Custer reported that Walker

---

[4] Johnson acknowledged at his deposition that he would drive his patrol car to Walker and Olivia's house to see Olivia. Johnson Dep. 76.

"stated" during the August 2, 2016 interview "that his wife was not involved with the distribution or purchase of any of the items located inside the house," and that it was Walker who was "buying large quantities of marijuana and selling/trading them inside of the residence." Pl.'s Ex. 28.

On June 9, 2017, Walker's mother, Susan Keith, went to the BCSO and advised Sheriff Ronald Sprinkle that Olivia was having an affair with Johnson. Keith Dep. 48, ECF No. 34-11. Sprinkle placed Johnson on administrative leave while the allegation was investigated. Sprinkle Dep. 17, ECF No. 50-2. On June 16, 2017, Sprinkle terminated Johnson for "carrying on an inappropriate relationship with a Confidential Informant." Defs.' Ex. 12, ECF No. 34-12. Sprinkle determined that Johnson's "unacceptable" actions "violate[d] several [enumerated] policies of the Botetourt County Sheriff's Office Policy and Procedures Manual." Id.

On June 23, 2017, the Botetourt County Circuit Court appointed Rhonda Overstreet to represent Walker in connection with the new indictments. Pl.'s Ex. 47, ECF No. 44-47. On June 27, 2017, Overstreet filed a motion for discovery, which was granted on July 13, 2017. Pl.'s Ex. 48, ECF No. 44-48. On July 25, 2017, the new indictments were nolle prossed at the request of the Commonwealth. Pl.'s Ex. 49, ECF No. 44-49.

Walker maintains that he was threatened by a BCSO lieutenant on the same day that the charges were nolle prossed. According to Walker, the lieutenant overheard him talking to a female deputy about Johnson. Walker Dep. 159. The lieutenant called Walker "a stupid drug addict piece of shit," claimed that Johnson had been "screwing [Walker's] wife since [Johnson] was in high school," and suggested that Walker would be subject to retaliation if he took any action against Johnson. Id. at 160.

On October 18, 2017, Custer met with other individuals regarding the money that was seized from Walker and Olivia's house during the execution of the search warrant. Pl.'s Ex. 64,

ECF No. 44-64. Five days later, the majority of the money was returned to Olivia, rather than Walker, even though he was the only one charged as a result of the search.[5] Pl.'s Ex. 63, ECF No. 44-63.

Walker was released from incarceration on August 22, 2018. During his deposition, Walker testified that he was aware of Johnson's affair with Olivia by "the summer of 2017," while he was still incarcerated. Walker Dep. 270. Walker testified that he had difficulty sleeping and eating after learning about the affair, which caused him to lose weight. Id. He went "back on medication because of the anxiety," and he received counseling services. Id. at 217. Walker also experienced panic attacks and developed a fear of law enforcement. Id. at 272.

### Procedural History

On October 22, 2018, Walker filed this action against Johnson, Custer, and other unknown defendants. In Count I, Walker seeks to hold Johnson and Custer liable under 42 U.S.C. § 1983 for alleged violations of his "right to due process of law" and his "right to be free from police harassment and intimidation." Compl. ¶ 76, ECF No. 1. In Count II, Walker claims that the defendants conspired to violate his federal constitutional rights. In Count III, Walker asserts a claim for abuse of process under Virginia law against Johnson and Custer. In Count IV, Walker asserts a state-law claim of intentional infliction of emotional distress against Johnson.

Following the completion of discovery, Johnson and Custer moved for summary judgment. The court held a hearing on the motion on March 10, 2020. The motion has been fully briefed and is ripe for review.

---

[5] The BCSO retained the portion of the funds that was used during the controlled transaction that occurred prior to the search of the house.

## Standard of Review

An award of summary judgment is only appropriate when there are no material facts in dispute and the moving parties are entitled to judgment as a matter of law. Wilson v. Prince George's Cty., 893 F.3d 213, 218 (4th Cir. 2018) (citing Fed. R. Civ. P. 56(a)). In considering a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255; Tolan v. Cotton, 572 U.S. 650, 657 (2014). To withstand a summary judgment motion, the nonmovant must produce sufficient evidence from which a reasonable jury could return a verdict in his favor. Anderson, 477 U.S. at 248.

## Discussion

### I.    Claims under § 1983

The court will first address Walker's claims under 42 U.S.C. § 1983. "Section 1983 . . . is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory rights." Safar v. Tingle, 859 F.3d 241, 245 (4th Cir. 2017) (citing Graham v. Connor, 490 U.S. 386, 393–94 (1989)). The statute imposes civil liability on any person who, acting under color of state law, deprives another person of rights and privileges secured by the Constitution and laws of the United States. 42 U.S.C. § 1983. Accordingly, in any action under § 1983, the court must begin its analysis by identifying the precise constitutional or statutory violation that the defendants allegedly committed. Safar, 859 F.3d at 245.

In this case, Walker contends that Johnson and Custer violated his right to due process by "fail[ing] to disclose and with[holding] from the prosecutor the fact that Johnson had developed an intimate, romantic, and sexual relationship with [Walker's] wife shortly after the search of his residence on July 28, 2016." Pl.'s Br. Opp'n Summ. J. 26, ECF No. 44. Relying on Brady v. Maryland, 373 U.S. 83 (1963), and its progeny, Walker argues that a "law enforcement officer's

suppression of evidence which is favorable to the accused will violate the Due Process Clause when that evidence is material to either guilt or punishment." Id. at 25. Walker further argues that the actions taken against him "support a claim for harassment under § 1983," as well as "a claim for conspiracy under § 1983." Id. at 37–38. The court will address each claim in turn.

A. **Due process under Brady**

Johnson and Custer have moved for summary judgment on the Brady-based due process claim on multiple grounds. Among other arguments, the defendants contend that the claim is barred by the doctrine of qualified immunity. For the following reasons, the court is constrained to agree.

As the Supreme Court of the United States has "explained many times," the doctrine of qualified immunity shields government officials from liability so long as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019) (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1152 (2018)); see also Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)). "To overcome this shield, a plaintiff must demonstrate that: (1) the defendant violated the plaintiff's constitutional rights, and (2) the right in question was clearly established at the time of the alleged violation." Adams v. Ferguson, 884 F.3d 219, 226 (4th Cir. 2017) (citing Mullenix, 136 S. Ct. at 308); see also Crouse v. Town of Moncks Corner, 848 F.3d 576, 583 (4th Cir. 2017) (citing Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)). An official is entitled to qualified immunity if either prong is not satisfied. Pearson, 555 U.S. at 236, 243–45.

The Supreme Court has held that lower courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances in the particular case at hand." Id. at 236. The Court has urged lower courts to "think carefully before expending 'scare judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'" al-Kidd, 563 U.S. at 735 (quoting Pearson, 555 U.S. at 236–37). Therefore, addressing the second prong before the first is especially appropriate in cases where "a court will rather quickly and easily decide that there was no violation of clearly established law." Pearson, 555 U.S. at 239. Because Walker's due process claim under Brady falls within this category, the court will proceed directly to the second prong.

Under the second prong, a government official is entitled to qualified immunity if the right at issue was not "clearly established at the time of the challenged conduct." al-Kidd, 563 U.S. at 735. The Supreme Court has explained that "[a] right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" Carroll v. Carman, 574 U.S. 13, 16 (2014) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Id. (quoting al-Kidd, 563 U.S. at 741). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640 (citations omitted). Thus, "if there is a legitimate question as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." Martin v. St. Mary's Dep't of Soc. Servs., 346 F.3d 502, 505 (4th Cir. 2003) (internal quotation marks and citations omitted); see also Francis v. Giacomelli, 588 F.3d 186, 196 (4th Cir. 2009) (holding that the defendant was entitled to qualified immunity since "his actions were not clearly unlawful when performed").

In this case, Walker contends that Johnson and Custer violated his right to due process "by withholding and concealing the fact that Johnson was having an intimate relationship with [Walker's] wife while they were furthering and pursuing criminal charges against him." Pl.'s Br. Opp'n Summ. J. 39. Relying on Brady, which was decided by the Supreme Court in 1963, Walker argues that "[t]here is no question that the requirement that a law enforcement officer disclose to the prosecutor favorable material information was well established long before Johnson's and Custer's improper actions," and that such information should have been disclosed "prior to his guilty plea." Id. at 39–40. For the following reasons, however, the court concludes that existing precedent does not support Walker's argument that he had a clearly established right to receive exculpatory or impeachment evidence prior to pleading guilty.

In Brady, the Supreme Court held that the prosecution's failure to disclose evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Supreme Court has since held that the duty encompasses impeachment evidence as well as exculpatory evidence, Giglio v. United States, 405 U.S. 150, 154 (1972), and that it includes evidence that is "known only to police investigators and not to the prosecutor," Kyles v. Whitley, 514 U.S. 419, 438 (1995). "The Brady right, however, is a trial right," which "exists to preserve the fairness of a trial verdict and to minimize the chance that an innocent person would be found guilty." United States v. Moussaoui, 591 F.3d 263, 285 (4th Cir. 2010). "When a defendant pleads guilty, those concerns are almost completely eliminated because his guilt is admitted." Id. Because Walker pled guilty to the charge arising from the vehicle stop and did not go to trial on any of the charges against him, there was no clearly established constitutional violation under Brady. See United States v. Brown, 576 F. App'x 145, 148 (4th Cir. 2014) ("Here, because no

trial occurred, Brown may not assert a constitutional violation.") (citing Moussaoui, 591 F.3d at 285).

To the extent that the nondisclosed evidence of Johnson's relationship with Olivia is considered impeachment evidence, Walker's Brady claim is foreclosed by the Supreme Court's decision in United States v. Ruiz, 536 U.S. 622 (2002). In Ruiz, the Supreme Court explained that the right to receive material impeachment evidence is "a right that the Constitution provides as part of its basic 'fair trial' guarantee,'" and that when a defendant pleads guilty, he "forgoes not only a fair trial, but also other accompanying constitutional guarantees." 536 U.S. at 628–629. The Court rejected the claim that a guilty plea was involuntary merely because the prosecution failed to disclose material impeachment information to the accused prior to his plea of guilty. Id. at 629. The Court concluded that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." Id. at 633. Thus, "Ruiz established that impeachment material need only be disclosed for trial." Robertson v. Lucas, 736 F.3d 606, 621 (6th Cir. 2014).

During the hearing on the pending motion, Walker argued that the evidence at issue in this case was not solely impeachment evidence, but also exculpatory evidence, and therefore not covered by the rule set forth in Ruiz. The problem with this argument, at least for purposes of qualified immunity, is that it remains "unsettled . . . whether there exists a Brady right to pre-plea disclosure of exculpatory evidence." Dicks v. Bishop, No. 1:17-cv-03667, 2019 U.S. Dist. LEXIS 216685, at *8 (D. Md. Dec. 17, 2019). "To date, the Supreme Court has not addressed the question of whether the Brady right to exculpatory information, in contrast to impeachment information, might be extended to the guilty plea context." Moussaoui, 591 F.3d at 286. And the Fourth Circuit has "explicitly declined to decide whether 'the prosecution's failure to disclose

material exculpatory evidence at the plea stage could result in an unknowing plea in certain narrow circumstances.'" United States v. Fisher, 711 F.3d 460, 472–73 (4th Cir. 2013) (Agee, J., dissenting) (emphasis in original) (quoting Moussaoui, 591 F.3d at 286); see also Dicks, 2019 U.S. Dist. LEXIS 216685, at *8 (noting that the Fourth Circuit "has not determined whether pre-plea withholding of exculpatory Brady material is a cognizable claim in federal habeas review"). Thus, whether the government has a duty to disclose exculpatory evidence in the context of a guilty plea is an "open question" in this circuit. Dicks, 2019 U.S. Dist. LEXIS 216685, at *9.

Moreover, "case law from . . . other circuits does not affirmatively establish that a constitutional violation occurs when [exculpatory] Brady material is not shared during the plea bargaining process." Alvarez v. City of Brownsville, 904 F.3d 382, 394 (5th Cir. 2018) (en banc), cert. denied, 139 S. Ct. 2690 (2019); see also Robertson, 753 F.3d at 621 (observing that the issue of "whether Ruiz applies to exculpatory Brady material . . . has caused some disagreement" among other circuits). Although the Seventh, Ninth, and Tenth Circuits have recognized the possible distinction between impeachment and exculpatory evidence in the guilty plea context, the Fifth Circuit has "rejected the . . . argument that . . . impeachment and exculpatory evidence should be treated differently, and that exculpatory evidence must be turned over before the entry of a guilty plea." Alvarez, 904 F.3d at 392–93 (citations omitted). Likewise, the First and Second Circuits "also seem to have doubts about a defendant's constitutional entitlement to exculpatory Brady material before entering a guilty plea." Id. at 392 (citations omitted). Thus, any right Walker may have had to receive exculpatory evidence prior to pleading guilty was "not clearly established." Robertson, 753 F.3d at 621; see also Ziglar v. Abbasi, 137 S. Ct. 1843, 1868 (2017) ("When the courts are divided on an issue so central to the cause of action alleged, a reasonable official lacks the notice required before imposing liability."); Gates v. Khokhar, 884 F.3d 1290,

1293 (11th Cir. 2018) ("That judges disagree about a constitutional issue is itself evidence that a right is insufficiently clearly established for purposes of denying qualified immunity.") (citing Wilson v. Layne, 526 U.S. 603, 618 (1999)).

For these reasons, the court concludes that Walker's Brady-based due process claim is barred by the doctrine of qualified immunity. Accordingly, the motion for summary judgment will be granted with respect to this claim.[6]

## B.    Harassment

The court is also constrained to conclude that Johnson and Custer are entitled to qualified immunity on the "claim for harassment under § 1983." Pl.'s Br. in Opp'n 37. Walker does not cite, and the court is unable find, any published decisions from the Fourth Circuit recognizing an independent claim for police harassment. See Booker v. S.C. Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017) (explaining that "unpublished opinions . . . cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity"). Likewise, Walker has not shown that the purported right to be free from police harassment was "clearly established based on general constitutional principles or a consensus of persuasive authority" from other circuits. Id.

In Arnold v. Truemper, 833 F. Supp. 678 (N.D. Ill. 1993), on which Walker relies in his brief in opposition, the district court agreed with the defendants that "police harassment, without more, cannot form a basis for a § 1983 cause of action." 833 F. Supp. at 682. The district court cited to the Sixth Circuit's decision in Bacon v. Patera, 772 F.2d 259 (6th Cir. 1985), in which the appellate court also ruled that a harassment claim was subject to dismissal:

> Bacon next argues that he has a right to be free from police
> harassment and intimidation. Both the fifth and sixth amendments

---

[6] In light of the court's conclusion that this claim is barred by the doctrine of qualified immunity, the court need not reach the issue of whether the claim is otherwise barred by Heck v. Humphrey, 512 U.S. 477 (1994).

are cited as the source of this right. These two amendments do provide a number of protections for the accused, including the right to remain silent, the right to counsel, the right to a speedy trial, and the right against double jeopardy, which could be viewed as having as one overall purpose protecting the accused from intimidation by police authorities. Nevertheless, we believe that these specifically enumerated rights are generally adequate to assure fair treatment for defendants, and we cannot conclude that these rights create a distinct cause of action for police harassment in this case.

772 F.2d at 264–65. Relying on Bacon, at least one district court has held that "there is no constitutional right to be free from police harassment and intimidation under the Fifth and Sixth Amendments." Ratunuman v. Sanchez, No. 1:09-cv-22937, 2010 U.S. Dist LEXIS 54571, at *20 (S.D. Fla. May 5, 2010). In this case, Walker also cites to the Fifth and Sixth Amendments as potential sources of a purported right to be free from police harassment. See Pl.'s Br. Opp'n 38. Based on the foregoing decisions, and the absence of controlling authority in this jurisdiction, the court concludes that the contours of any such right were not clearly established at the time of the events giving rise to this action.

Additionally, the court must reject Walker's alternative argument, made during the hearing on summary judgment, that the defendants are not entitled to qualified immunity because their actions and omissions in pursuing charges against Walker, including withholding evidence of Johnson's affair with Olivia, "shocks the conscience," in violation of the Fourteenth Amendment's substantive due process protections. The Fourth Circuit has made clear that "[t]he Due Process Clause is not the proper lens through which to evaluate law enforcement's pretrial missteps." Sims v. Labowitz, 885 F.3d 254, 265 n.5 (4th Cir. 2018) (internal quotation marks omitted) (holding that qualified immunity barred a substantive due process claim arising from a sexually invasive search of a minor during which the minor was forced to masturbate in the presence of others); see also Safar, 859 F.2d at 245 (holding that the defendants' failure to withdraw arrest

warrants after learning that the charges were erroneous did not give rise to an actionable claim under the Fourteenth Amendment). "Consequently, a police officer who withholds exculpatory information does not violate the Fourteenth Amendment unless the officer's failure to disclose deprived the plaintiff of the 'right to a fair trial.'" Safar, 859 F.2d at 245 (quoting Taylor v. Waters, 81 F.3d 429, 436 n.5 (4th Cir. 1996)). Because Walker did not proceed to trial on any of charges pursued against him, the defendants' failure to disclose evidence of the affair did not deprive Walker of any clearly established right under the Fourteenth Amendment. Taylor, 81 F.3d at 436 & n.5.

Finally, insofar as Walker's claim for harassment is based on violations of BCSO policies and practices, such violations do not implicate clearly established constitutional rights. See Morris v. City of Danville, 744 F.2d 1041, 1048 n.9 (4th Cir. 1984) (recognizing that the "mere fact that a state agency violates its own procedures does not, ipso facto, mean that it has contravened federal due process requirements"); see also Thompson v. City of Chicago, 472 F.3d 444, 454 (7th Cir. 2006) ("[T]his court has consistently held that 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices. In other words, the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established.") (internal quotation marks and citations omitted).

For all of these reasons, the court concludes that Walker's harassment claim under § 1983 is barred by the doctrine of qualified immunity. Accordingly, the defendants' motion for summary judgment will be granted with respect to this claim.

## C.    Conspiracy

In Count II of the complaint, Walker asserts that the defendants conspired to deprive him of his constitutional rights, in violation of § 1983. "To establish a conspiracy claim under § 1983, a plaintiff 'must present evidence that the [defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in [the] deprivation of a constitutional right.'" Massey v. Ojaniit, 759 F.3d 343, 357–58 (4th Cir. 2014) (alterations in original) (quoting Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996)).

For the reasons explained above, Johnson and Custer are entitled to qualified immunity on the underlying constitutional claims asserted against them. Consequently, "they are entitled to judgment on the corresponding conspiracy claims." Gill v. City of Milwaukee, 850 F.3d 335, 342 (7th Cir. 2017); see also N.E.L. v. Douglas Cty., 740 F. App'x 920, 931 n.22 (10th Cir. 2018) ("Because Adame and Deputy Garza are entitled to qualified immunity against N.E.L. and M.M.A.'s Fourth Amendment and Fourteenth Amendment claims, they are also entitled to such qualified immunity against N.E.L. and M.M.A.'s civil conspiracy claim based on the alleged violations of those same rights."); Conner v. Heiman, 672 F.3d 1126, 1133 (9th Cir. 2012) ("The finding that Neil and Heiman have qualified immunity also bars Conner's § 1983 conspiracy claim. As this Court noted in Haldeman v. Golden, a § 1983 conspiracy claim 'is not a means of holding state actors liable on claims from which they are otherwise immune.'") (quoting 359 F. App'x 777, 780 (9th Cir. 2009)); Hale v. Townley, 45 F.3d 914, 921 (5th Cir. 1995) ("[I]n this case, all officers alleged to have violated Hale's First Amendment rights are entitled to qualified immunity. Therefore, the conspiracy clam is not actionable."); Hagans v. Kennedy, No. 5:17-cv-00379, 2019 U.S. Dist. LEXIS 47258, at *30 (M.D. Ga. Mar. 21, 2019) ("It stands to reason that if the Court finds that the public officer alleged to be involved in a civil conspiracy is

entitled to qualified immunity on the underlying claim for a denial of a constitutional right, the plaintiff's civil conspiracy claim fails as a matter of law.") (citing Signature Pharm., Inc. v. Wright, 438 F. App'x 741, 746 (11th Cir. 2011)).

## II. Claims under state law

In addition to his claims under § 1983, Walker asserts two claims under state law. In Count III, Walker asserts a claim for abuse of process against Johnson and Custer. In Count III, Walker asserts a claim for intentional infliction of emotional distress against Johnson. The court will address each claim in turn.[7]

### A. Abuse of process

Under Virginia law, abuse of process is defined as "the wrongful use of process after it has been issued." Triangle Auto Auction, Inc. v. Cash, 380 S.E.2d 649, 650 (Va. 1989) (emphasis omitted). "To sustain a cause of action for abuse of process, a plaintiff must plead and prove: (1) the existence of an ulterior purpose; and (2) an act in the use of the process not proper in the regular prosecution of the proceedings." Donohoe Constr. Co. v. Mt. Vernon Assocs., 369 S.E.2d 857, 862 (Va. 1988).

The Supreme Court of Virginia has explained that a "legitimate use of process to its authorized conclusion, even when carried out with bad intention, is not a malicious abuse of that process." Id. Rather, the "distinctive nature of malicious abuse of process lies in the perversion of regularly-issued process to accomplish some ulterior purpose for which the procedure was not

---

[7] The court recognizes that its sole basis for jurisdiction over the state-law claims is supplemental jurisdiction under 28 U.S.C. § 1367. The court finds that the factors of judicial economy, convenience, and fairness weigh in favor of retaining jurisdiction. See Bishop v. Cty. of Macon, 620 F. App' 148, 150 (4th Cir. 2015) ("In deciding whether to exercise supplemental jurisdiction, a court should consider 'the values of judicial economy, convenience, fairness, and comity.'") (quoting Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)). The parties have completed discovery, and a jury trial is scheduled to begin on June 24, 2020. "To dismiss the case at this late stage would be unfair and inconvenient to the parties and would waste judicial resources by forcing [the plaintiff] to start from scratch in state court." Back v. Virginia, No. 7:17-cv-00477, 2019 U.S. Dist. LEXIS 206042, at *24 n.10 (W.D. Va. Nov. 27, 2019).

intended." Id. For instance, "[p]rocess is maliciously abused when it is used oppressively, . . . or as a means of extortion." Id. "The gravamen of the tort lies in the abuse or the perversion of the process after it has been issued." Id.

Viewing the record in the light most favorable to Walker, the court concludes that a reasonable jury could find that Johnson and Custer acted with an ulterior motive in continuing to pursue charges against Walker. It is undisputed that Johnson had an affair with Walker's wife, and the record supports a finding that the romantic relationship began within a few weeks after Walker was indicted for the controlled substances found during the vehicle stop. According to Walker's evidence, the affair continued throughout the criminal proceedings arising from the stop, and likely remained ongoing at the time Walker was indicted for the controlled substances found in his family's house. Johnson allegedly told Olivia's mother that Walker would be in prison for a long time, and a reasonable jury could find from the totality of the evidence that Johnson acted to ensure that Walker remained incarcerated in order to maintain his affair with Olivia.

The evidence presented by Walker, when viewed in his favor, would also allow a reasonable jury to find that Custer was aware of Johnson's relationship with Olivia and shared his ulterior motive for keeping Walker incarcerated. Johnson and Custer worked closely together in a very small narcotics department, and Custer knew that Johnson was spending time alone with Olivia—in violation of BCSO policy—while Olivia worked as a confidential informant. The court recognizes that Johnson, Custer, and Olivia have denied that Custer had knowledge of the affair. Viewing the totality of the evidence in the light most favorable to Walker, however, the court believes that a reasonable jury could discredit their testimony and reach a contrary finding.

The second element of a claim for abuse of process requires proof of at least one "act in the use of the process not proper in the regular prosecution of the proceedings." Donohoe Constr.

Co., 369 S.E.2d at 862. Viewing the evidence in light most favorable to Walker, the court concludes that a reasonable jury could find that multiple irregular acts occurred in the course of the criminal proceedings against Walker. For instance, the court agrees with Walker that a reasonable jury could find that Johnson and Custer improperly concealed Johnson's relationship with Walker's wife, in violation of BCSO policies and procedures; failed to report Walker's work as a confidential informant to the Commonwealth's Attorney's Office, in violation of the cooperation agreement; took advantage of Walker's desire to protect his wife by encouraging him to take sole responsibility for the drugs found in the family's house; selectively submitted narratives suggesting that Walker was solely responsible for the drugs; pursued charges prior to receiving lab test results; and delayed sending the drugs from the house to the lab until Walker had already pled guilty to the charge arising from the vehicle stop. Accordingly, the court concludes that Johnson and Custer are not entitled to summary judgment on the claim for abuse of process. See, e.g., Danjczek v. Spencer, 156 F. Supp. 3d 739, 757 (E.D. Va. 2016) ("By declining to withdraw his complaint against Danjczek, Spencer subjected Danjczek to additional coercive power of process when she was required to defend herself against the ongoing criminal case and to appear in Caroline County General District Court on June 30, 2015. Because Spencer's continuing misconduct subjected Danjczek to additional coercive pressures of the judicial system, the motion to dismiss [the claim for abuse of process] will be denied.").

### B. Intentional infliction of emotional distress

Walker's final claim is for intentional infliction of emotional distress against Johnson. Such claims are disfavored in Virginia and require proof of the follow elements by clear and convincing evidence: (1) that "the wrongdoer's conduct was intentional or reckless"; (2) that "the conduct was outrageous or intolerable"; (3) that "there was a causal connection between the

wrongdoer's conduct and the resulting emotional distress"; and (4) that "the resulting emotional distress was severe." <u>Supervalu, Inc. v. Johnson</u>, 666 S.E.2d 335, 343 (Va. 2008).

Even assuming that a reasonable jury could find that Walker satisfied the first three elements, the court concludes that Walker's claim for intentional infliction of emotional distress cannot withstand summary judgment, since he has failed to proffer evidence sufficient to establish the degree of emotional distress required to meet the fourth element. With respect to that element, the Supreme Court of Virginia has emphasized that "liability arises only when the emotional distress is extreme, and only where the distress inflicted is so severe that no reasonable person could be expected to endure it." <u>Russo v. White</u>, 400 S.E.2d 160, 163 (Va. 1991).

In <u>Russo</u>, the Supreme Court held that a plaintiff complaining of nervousness, sleep deprivation, stress and its physical symptoms, withdrawal from activities, and an inability to concentrate at work, failed to allege the type of extreme emotional distress that gives rise to liability. <u>Id.</u> Applying <u>Russo</u> in <u>Harris v. Kreutzer</u>, 624 S.E.2d 24 (Va. 2006), the Supreme Court likewise held that the plaintiff's allegations of "severe psychological trauma and mental anguish affecting her mental and physical well-being," with symptoms including "nightmares, difficulty sleeping, extreme loss of self-esteem and depression, requiring additional psychological treatment and counseling," were "insufficient to satisfy the fourth element" of the test for intentional infliction of emotional distress. <u>Harris</u>, 624 S.E.2d at 34.

The following year, in <u>Almy v. Grisham</u>, 639 S.E.2d 182 (Va. 2007), the Supreme Court found that the plaintiff had adequately alleged severe emotional distress where she asserted that the defendants' conduct "caused her to suffer from several debilitating conditions, including depression, nervousness, and an inability to sleep, which ultimately caused a complete disintegration of virtually every aspect of her life." <u>Almy</u>, 639 S.E.2d at 188. In distinguishing

cases such as Russo and Harris, the Supreme Court noted that "[w]hile both Almy and the plaintiff in Harris alleged that they required counseling and suffered from severe psychological trauma, depression, humiliation and injury to reputation, Almy additionally alleged that the defendants' actions rendered her functionally incapable of carrying out any of her work or family responsibilities." Id. The Supreme Court further emphasized that, "[a]ccording to Almy, her emotional distress reached such a level of severity that '[e]very aspect of [her] life [was] fundamentally and severely altered,' such that she 'had trouble even walking out of the front door.'" Id. (alterations in original).

Applying the foregoing decisions, the court concludes that Walker has failed to proffer sufficient evidence to establish that he suffered the level of severe emotional distress required to succeed on this claim. During his deposition, Walker testified that he had difficulty sleeping and lost weight after learning about Johnson's relationship with his wife, that he experienced anxiety and panic attacks for which he sought treatment while he was incarcerated, and that he developed a fear of law enforcement. Given the high bar set by the Supreme Court of Virginia, the court is convinced that the evidence proffered by Walker would not allow a reasonable jury to find that he experienced emotional distress "so severe that no reasonable person could be expected to endure it." Russo, 400 S.E.2d at 163; see also Stout v. Allstar Therapies, Inc., No. 3:17-cv-00592, 2018 U.S. Dist. LEXIS 71447, at *7 (E.D. Va. Apr. 27, 2018) ("Stout's symptoms of anxiety, anger, panic attacks, lack of concentration, and significant insomnia do not meet the severity requirement under Virginia law."); Zaklit v. Global Linguist Solutions, LLC, 53 F. Supp. 3d 835, 848–49 (E.D. Va. 2014) ("Plaintiffs also allege that they suffered 'severe emotional distress and anxiety' [as a result of the defendant's actions, which] caused Plaintiffs 'to suffer additional illnesses and physical injuries, pain and suffering, inconvenience, medical expenses, future medical expenses,

and other damages.' These allegations do not rise to the level of distress required to satisfy the final element of a claim for intentional emotional distress."). Accordingly, the court will grant the motion for summary judgment with respect to Count IV.

## Conclusion

For the reasons stated, the motion for summary judgment will be granted in part and denied in part. The case will proceed to trial on the claim for abuse of process against Johnson and Custer.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This 18th day of March, 2020.

_____
Senior United States District Judge